UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALICIA KIRTON,<br><br>      *Plaintiff*,<br><br>v.<br><br>CHAD F. WOLF, Acting Secretary, Department of Homeland Security, and<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY,<br><br>      *Defendants*. | Civ. A. No. 18-1580 (RCL) |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h)(2), Defendants Chad F. Wolf, Acting Secretary of the U.S. Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA" or the "Agency"), by and through undersigned counsel, hereby submit the following statement of material facts as to which there is no genuine dispute in support of Defendants' motion for summary judgment.

**I.    Plaintiff's Employment with FEMA**

    1.    Plaintiff Alicia R. Kirton ("Plaintiff") is an African-American female. Am. Compl. ¶ 13 (ECF No. 4).

    2.    Defendant FEMA is an Agency of the United States Government and is responsible for, among other things, responding to Presidentially-declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. §§ 5121 et seq.; *see also* Executive Order No. 12148 of July 20, 1979; 44 Fed. Reg. 43239.

    3.    Plaintiff worked as a GS-13 Budget Analyst in the Funds Control Branch within the Budget Planning & Analysis Division ("BPAD") of FEMA's Office of the Chief Financial

Officer ("OCFO").  Am. Compl. ¶ 14; A. Kirton Aff. ¶ 10 (June 18, 2017) (Report of Investigation for Agency Case No. HS-FEMA-25619-2016 ("2017 ROI"), Tab F-1 at 3 of 10) (Ex. 1).

4.	As a Budget Analyst for FEMA, Plaintiff's duties included: analyzing the funds assigned to each assigned program within the Agency's funding system, ensuring the program funding is balanced, approving lines of accounting in the budget reporting system, and other duties as assigned.  Kirton Aff. ¶ 5 (Ex. 1); *see also* Position Description for Budget Analyst, GS-0560-13 (ROI for Agency Case No. HS-FEMA-00630-2019 ("2019 ROI"), Tab F-6) (Ex. 2).

5.	Plaintiff's first-level supervisor was Melissa Ellis, the Acting Funds Control Branch Chief within BPAD.  Ellis Decl. ¶ 3 (Sep. 8, 2020) (Ex. 3).[1]

6.	As a Budget Analyst, Plaintiff was assigned FEMA program offices with whom she would coordinate to ensure their funds were allocated in the Agency's financial system so they could spend the money and execute FEMA's mission.  Ellis Decl. ¶¶ 12-13.  To ensure funding was allocated correctly, Plaintiff was tasked with reviewing the programs' planned budgetary activity.  *Id.* ¶ 12.

7.	Plaintiff's job required that she meet with her customers, i.e., the program offices, on a regular basis to review and discuss their plan to ensure their funding was in alignment with their spend plan.  Ellis Decl. ¶ 13.  Representatives from various FEMA program offices routinely come to BPAD's offices in FEMA Headquarters to meet with Budget Analysts, such as Plaintiff, when they have questions or need financial advice.  *Id.*  While this was sometimes done by phone or video in the 2015 timeframe, some customers requested to meet with Budget

---

[1]	The Ellis Declaration and its accompanying Exhibits A through U are included as a composite in Defendant's Exhibit 3.

2

Analysts in person. *Id.* As a supervisor, Ellis felt it was important to have Budget Analysts physically come into the office to be available to provide those services to their customers. *Id.*

## II.     The Agency's Applicable Policies on Telework

### A.     FEMA Telework Manual

8.      On January 9, 2013, the Agency implemented FEMA Manual 123-9-1, Telework. *See* 2017 ROI, Tab G-5 (Ex. 4) ("FEMA Telework Manual").

9.      At FEMA, "[t]eleworking is a voluntary work alternative that may be appropriate for some employees and some jobs." *Id.*, Foreword, at 3 of 24). But telework "is not an entitlement and in no way changes the terms and conditions of employment with the Agency." *Id.*; *see also id.* § 2-1(A), at 16 of 24 ("[P]articipation in telework is not an employee entitlement.").

10.     "The FEMA telework program embraces the premise that all positions are presumed suitable for telework, **unless** the official duties require, on a daily basis, an employee to be physically present at a worksite because the employee's duties cannot be performed remotely or from an alternate worksite." *Id.* § 1-5, at 6 of 24 (emphasis added).

11.     The FEMA Telework Manual states that "[i]f the employee *does not* regularly commute into the agency office at least twice each biweekly pay period, the official duty station must be changed to the alternate worksite." *Id.* § 3-3(D), at 20 of 24 (emphasis in original).

12.     Additionally, Section 1-7(J)(5) of the FEMA Telework Manual states that "[a] request for approval for an employee to telework outside of their normal commuting area or in another geographical area should be handled as a request for change of duty location and not a telework request." *Id.* at 13 of 24.

13.     Among other things, employees are responsible for "completing and signing a telework agreement detailing the location and requirements of the alternate worksite." *Id.* at 14.

**B.     BPAD Telework Policy**

14.    In 2014 and early 2015, as the Agency moved to a more telework-friendly environment, Shalini Benson, Deputy Budget Director of OCFO, expressed her expectation that every manager still needed to see their employees at least twice a week physically in the office. Benson Decl. ¶¶ 2, 12 (Sep. 8, 2020) (Ex. 5);[2] Ellis Decl. ¶¶ 9-10; *see also* Kirton AFPD 717-18 (Ex. 6) (in response to an employee's request to increase her telework to two days per week, Benson wrote "I'd like to make sure that you a.) physically see everyone at least twice a week and b.) have at least one day when your entire team is in. I'd also like to make sure you and I overlap by at least two days, though preferably more.").

15.    OCFO's duties involved a great deal of customer service, which Benson thought was improved with face-to-face interaction. Benson Decl. ¶ 12. That said, Benson was willing to grant exceptions on a case-by-case basis if sufficiently justified. *Id.*

16.    On April 23, 2015, Benson sent an email of her "telework expectations" to her management team. Benson Decl. ¶¶ 2, 13-14 & Ex. A (Kirton AFPD 727) (Ex. 5); Ellis Decl. ¶¶ 9-10. Benson emailed to let the team know her expectations regarding telework because there had been some turnover in personnel. Benson Decl. ¶ 13.

17.    Among other things, Benson advised her subordinates that she expected everyone to report to their duty station at least twice per week and that managers see their employees twice per week. Benson Decl. ¶ 13. Though not an official, Agency-wide policy, both Benson and Ellis understood Benson's email to contain a statement of Benson's expectations concerning BPAD employees' telework (hereinafter, the "BPAD telework policy"). *Id.*; Ellis Decl. ¶ 10.

---

[2]    The Benson Declaration and all of its accompanying exhibits are included as a composite in Defendant's Exhibit 5. As the Deputy Budget Director, Benson was Kirton's second-level supervisor. Benson Decl. ¶ 3.

4

18. Benson maintained her expectations regarding supervisors seeing their employees in the office because, though the Agency had been generally becoming more telework friendly, there was a change in CFO around this same time and the incoming CFO, Tom Lowry, was less telework-friendly than the outgoing Chief Financial Officer, Ed Johnson, regarding Budget Analysts because they were particularly customer service oriented. Benson Decl. ¶ 14. Lowry conveyed that he wanted Budget Analysts to be in the office more irrespective of FEMA's shift in telework perspective, including Miller who Lowry required to come into the office occasionally throughout the year though not as much as the other Budget Analysts. *Id.* So, when the CFO changed there was a change in culture as it pertained to remote work for Budget Analysts in OCFO. *Id.*

19. As further explained below, the BPAD telework policy, as stated in Benson's April 2015 email, did not immediately require a change in duty station for Mark Miller (who at that time was already working remotely from his home in Oklahoma) or a change in the telework arrangement for Jennifer Wohltman (who was full-time telework from New Jersey). Benson Decl. ¶¶ 15-16; Ellis Decl. ¶ 10.

**III.    Two Other BPAD Employees Who Were Permitted Full-Time Telework or a Change in Duty Station Before Plaintiff's Requests in 2015.**

**A.    Mark Miller Granted Change in Duty Station in 2013.**

20. In or around January 2013, Miller was permitted by his then-supervisors, Evan Farley ("Farley") and Michael Darby ("Darby"), to begin teleworking full-time so he could be with his wife while she underwent medical treatments. FEMA 236-38 at 237 (Ex. 7).[3] Darby informed Miller that he either needed to request medical telework or FMLA. *Id.* at 236.

---

[3] Documents with the bates label prefix "FEMA" refer to Defendants' document production in this case. Documents with the bates label prefix "Kirton AFPD" refer to the Agency's first production of documents in the administrative proceeding that preceded this

21. In March 2013, Darby sent an email to Farley advising him of Miller's request for medical telework due to his own illness and included medical documentation to Miller and references to FEMA policy. FEMA 144-47 at 144-45 (Ex. 8). Darby noted that Miller could be granted medical telework for up to six months, but had to be reviewed by the supervisor every 30 days. *Id.* at 144-45. Darby informed Miller that his request for medical telework had been approved. *Id.* at 144.

22. Effective July 2013, Miller's duty station was changed from Washington, D.C., to Moore, OK, where he lived. Notification of Personnel Action §§ 5-B and 39 (Kirton AFPD 735) (Ex. 9); Kirton AFPD 75 (Ex. 18); *see also* FEMA 152 (Ex. 10); FEMA 148 (telework timeline from Miller includes statements that from "2/20/13 to present I am under doctors care" and that "medical documentation and new telework agreement submitted to supervisor") (Ex. 11); FEMA 045-49 at 49 (Ex. 12) (Agency's agreement from July 2013 to reassign Miller to Oklahoma for six months and request for follow-up recommendation to the six-month extension expiration).

23. Accordingly, when Benson became the Deputy Budget Director of OCFO in June 2013, the Agency had already decided to permit Miller to work remotely on a full-time basis from his home in Oklahoma, which became his official duty station. Benson Decl. ¶ 4. Miller's duty station and unique working arrangement was initially intended to be temporary and subject to periodic review by Darby. *Id.* ¶ 5.

24. In 2013, the Agency informally decided to make Miller's duty station change permanent. Benson Decl. ¶ 5. Before he departed the Agency, Benson's supervisor, Evan Farley, instructed Benson that so long as Miller was performing adequately, the Agency was not

---

action. Attachments to emails that were produced as part of the Kirton AFPD production during the administrative proceeding were not stamped with a bates label. For any such attachments that are cited in this Statement of Facts, the email and attachment are grouped as a single exhibit.

6

planning to take any action regarding Miller's work arrangement. *Id.* ¶ 6. When Farley directed Benson not to take any action regarding Miller's remote work arrangement, she was not concerned about it since Farley and Darby were satisfied with it so long as Miller was performing adequately. *Id.* ¶ 8. For the next few years, Benson and Ellis followed their predecessors' decision to allow Miller to continue work remotely from his duty station in Oklahoma. *Id.* ¶ 8; Ellis Decl. ¶¶ 4-5.

### B.     Jennifer Wohltman Granted Full-Time Telework Status in 2014.

25.     In 2014, Jennifer Wohltman, Accountant, requested to work from her home in New Jersey full time. Benson Decl. ¶ 9. Benson approved Wohltman's request in late 2014. *Id.*

26.     Benson approved Wohltman to work from her home in New Jersey full-time because she determined that it would not have any impact on her duties because she was essentially teleworking full-time already since she was working at FEMA Headquarters in Washington, D.C., and her clients worked at the FEMA Finance Center in Winchester, VA, which is about 75 miles away from FEMA Headquarters. Benson Decl. ¶ 10. As a result, she was essentially working remotely already. *Id.* Additionally, Wohltman was a stellar employee and BPAD's only accountant so Benson wanted to ensure that she did not leave the Agency, which Benson believed she would do if they did not grant her request. *Id.*

27.     Benson discussed changing Wohltman's duty station with Johnson and Tom Lowry, Deputy CFO, at that time, but they decided against it because they were unsure how long she would stay with the Agency and did not want to go through the trouble of changing her duty station if she was going to leave shortly thereafter. Benson Decl. ¶ 11. In addition, the locality pay in New Jersey was higher than in Washington, D.C. *Id.* Accordingly, the Agency decided to keep Wohltman's official duty station as Washington, D.C. *Id.*

7

28.     Ellis, who became Wohltman's supervisor in April 2015, concurred with Benson's assessment. Ellis Decl. ¶¶ 6-8. In particular, Ellis did not view Wohltman's duties as benefitting as much from or needed face-to-face interaction with others, as did the Budget Analyst positions held by Miller and Plaintiff. *Id.* ¶ 7. Additionally, Wohltman's customers were physically located in the FEMA Finance Center in Winchester, VA; therefore, it was not as necessary for Wohltman to come into the office. *Id.*

29.     As with Miller, therefore, Ellis "grandfathered" Wohltman into her preexisting telework arrangement. Ellis Decl. ¶ 8. Because there was not a compelling business need for her to come into the office, it would have been unfair to require her to move her life back to Washington, D.C. *Id.* Wohltman had also demonstrated high performance in her existing telework arrangement. *Id.* And as the only accountant in BPAD, Ellis viewed Wohltman as indispensable. *Id.*

## IV.     The Agency's Decision in 2016 to Deny Plaintiff's Request for Full-Time Telework and/or Duty Station Change.

30.     On December 18, 2015, Kirton submitted a request to Ellis via email for 95-100% telework based on her commute from her home in Chester, Virginia. Ellis Decl. ¶ 11 & Ex. B (Kirton AFPD 360-61) (Ex. 3); Benson Decl. ¶ 17.

31.     In support of her request to telework at 95-100%, Plaintiff wrote the following to Ellis and Benson:

> After speaking with you and discussing the agencies [sic] telework opportunities with my family [sic], [m]y family and I have reviewed the situation and believe due to my current commute situation, it would be most advantageous to us as a family and more beneficial to the agency, if I would make the request to perform 95-100% telework.
>
> Please be advised that this email serves as my official request to be approved to utilize the opportunity to participate in the agencies [sic] 95-100% telework program beginning January 2016. My current commute to work is approximately 3 hrs each way. To avoid traffic congestion, I must leave my home at 2:30 in the

> morning, which causes my work and family life to be compromised considerably. My family has supported my commuting situation for over 8 years but now due to family demographic changes, my long distance commute is causing strain on several areas of my family's home life, which in turn can result in me taking extensive leave.
>
> Being able to telework at a higher rate will allow more time for me to work and interact with my peers via LYNC as well as have quality time to spend with my family. I am aware that I will be required to commute to DC periodically and I fully accept that requirement.

Kirton AFPD 360 (Ellis Decl. Ex. B) (Ex. 3). Plaintiff's request to her supervisors referenced her three-hour commute to and from Chester, VA, but made no mention of the fact that Plaintiff had already decided to move to Florida at the end of the month.

32. That same day, December 18, 2015, Plaintiff forwarded her telework request in an email to her colleague, Sheila Goode. Plaintiff stated that "come January I will email [Ellis] each Tuesday and Wednesday to say I will be teleworking. [I]f she say[s] no then will inform her that I have moved out of state and cannot come in the office but once a month." Kirton AFPD 666 (Ex. 13).

33. On December 20, 2015, Ellis emailed her superior, Benson, advising her of Plaintiff's request for full-time telework. Benson Decl. ¶ 18 & Ex. C (Kirton AFPD 662) (Ex. 5). Unaware of the fact that Plaintiff had already decided to move her family to Florida, which would render any sort of weekly commute impossible, Ellis proposed to Benson that the Agency make an exception to BPAD policy by permitting Plaintiff to only come into the office two days per pay period. Ellis Decl. ¶ 14 & Ex. C (Kirton AFPD 662) (Ex. 3).

34. Ellis proposed this as a compromise between the full-time (or nearly full-time) telework that Plaintiff requested and the maximum telework of four days per pay period (i.e., two days per week) that were permitted under BPAD policy at that time. Ellis Decl. ¶ 14; *see also* Benson Decl. ¶ 18.

9

35.     Benson responded that she was "not comfortable deviating from [the] office norm of in person 2 days a week without a justification on how you'll accomplish mission, meet customer needs, ensure equity with other staff, etc." Benson Decl. ¶¶ 18-19 & Ex. C (Kirton AFPD 662) (Ex. 5); Ellis Decl. ¶ 15. Benson advised Ellis to "not approve until that justification has been provided." Benson Decl. ¶¶ 18-19; Ellis Decl. ¶ 15. Ellis forwarded Benson's request for additional information to Plaintiff. Benson Decl. ¶ 19; Ellis Decl. ¶ 16.

36.     On December 22, 2015, Plaintiff sent Ellis an email regarding her request for 95-100% telework. Plaintiff advised that her request was based on her current commuting time to and from Chester, VA, which was a minimum of 2 ½ to 3 hours one way. Ellis Decl. ¶ 16 & Ex. D (2017 ROI, Tab G-14 at 3 of 4) (Ex. 3). Plaintiff's email also states that she and her husband had already decided to move to Florida, although the email does not specify when the move to Florida would take place. Ellis Decl. Ex. D. Although the request was purportedly based on her current commute time from her home in Chester, VA, Ellis interpreted it as a request to telework fulltime from her new home in Florida, because a commute from Florida to D.C. would be impossible. Ellis Decl. ¶ 16.

37.     On December 29, 2015, after discussing the request with Benson and a Human Resources Specialist, Julia Goldberg, Ellis responded by denying Plaintiff's request for 95-100% telework. Ellis Decl. ¶¶ 17-20 & Ex. E (2017 ROI, Tab F-2 at 2 of 3) (Ex. 3); Benson Decl. ¶ 20. Ellis explained her decision as follows:

> I have reviewed your request for 95-100% telework, and subsequent change in duty station. Per FEMA's Telework Policy, if an employee commutes into the office less than 2 days per pay period, the Duty station needs to change to the employee's telework location.
>
> The BPAD Telework Policy is that every employee needs to come into the office at least 2 days per week. As a Funds Control Budget Analyst, your job requires face-to-face engagement with your customers and Analysis Branch counterparts. Also, coming into the office enhances team building with other staff members, on

> the job training and promotes collaboration. This is all key to us improving our relationships with our customers to ensure we are on track to creating a proactive work environment. Additionally, because our division needs to have staff available in the office on a daily basis, and because most of our team regularly teleworks 2-3 times per week, I am not currently able to increase the amount of time that you telework away from the office. Unfortunately, I regret to inform you that I cannot approve an increase in your telework, and therefore I am also denying a change in Duty Station for you.

Ellis Decl. ¶ 20 & Ex. E; *see also* Ellis Affidavit ¶ 16 (Oct. 11, 2017) (2017 ROI, Tab F-2) (Ex. 14) (explaining that she could not approve Plaintiff's request because her duties as a Budget Analyst required that she come into the office to meet with her customers and coworkers).

38. Plaintiff moved to Florida at the end of December 2015. On December 22, 2015, Plaintiff sent an email to her friend, Beverly Pearson, concerning her telework request. Plaintiff expressed her disappointment at Ellis's decision to deny her request. Recounting her recent conversation with Ellis, Plaintiff wrote to Pearson: "Then I dropped the bomb on her [Ellis]. I told her after I spoke with Shalini and she made that statement about not where you work, my husband and I decided to move to Florida *which I will be moving the end of this month*.. well her mouth dropped open." Kirton AFPD 661 (Ex. 15) (emphasis added).

39. On or about January 20, 2016, Kirton submitted a new request using the Agency's Telework Application and Agreement (FEMA Form 123-9-01). In this new application, Plaintiff requested to telework (Alternative Work Location or "AWL") Monday through Friday of the first week and Monday and Tuesday of the second week. Ellis Decl. ¶ 21 & Ex. F (2017 ROI, Tab G-6) (Ex. 3).

40. On or about that same date, Plaintiff and Benson had a conversation concerning FEMA's and BPAD's telework policies as they pertained to her request for full-time telework. As Benson explained in a January 20 email to Ellis:

> I asked how she [Plaintiff] was doing and how her move went. We had a discussion about FEMA's telework policy and BPAD's telework policy. I went over my rule

11

that folks see their direct reports twice a week. I let her know that when there were deviations form that policy – for example, when she teleworked all of last week and when her brother passed, that your checked with me before approving that.

I let her know that you'd be sending her the email I sent out to all the branch chiefs. She expressed concern that our telework policy was unfair because some employees were granted flexibilities that others were not.

I did not comment on the specifics of the two individuals who were on full time telework or near full time telework. I did tell her that all requests employees submitted were considered carefully. I did also let her know that other organization with similar customer service missions, such as OPPA, telework a lot less frequently (1 day per week) than BPAD and reiterated that telework is the managers discretion.

She mentioned she filled out her request again, this time using the proper forms.

Benson Dec. ¶ 22 & Ex. E (Kirton AFPD 554) (Ex. 5).

41. The new application that Plaintiff submitted on January 20, 2016, stated that Plaintiff would come into the office Wednesday and Thursday of the second week and Friday would be an off-day due to her compressed work schedule (CWS). Ellis Decl. Ex. F (Ex. 3). The application requested this new telework arrangement to begin on February 21, 2016. *Id.* The application listed Plaintiff's official duty station as Washington, D.C. Plaintiff designated her home address in Chester, Virginia, as the alternate work location where she would be teleworking. *Id.*; Ellis Decl. ¶ 22; Ellis Decl. Ex. G (2017 ROI, Tab G-10) (Ex. 3).

42. On January 21, 2016, Ellis emailed Plaintiff the guidance she received from Benson on April 23, 2015, regarding the requirement that employees be in the office at least two days per week. Ellis Decl. ¶ 21 & Ex. G (2017 ROI, Tab G-10) (Ex. 3). Plaintiff responded, "Thank you Melissa I appreciate your input; however I am going to stick with the request sent to you on yesterday." Ellis Decl. Ex. G.

43. Ellis denied the request a second time because Plaintiff had provided no new information in support of her request. Ellis Decl. ¶¶ 22-23; Ellis Decl. Ex. G (Ex. 3). Moreover,

that folks see their direct reports twice a week. I let her know that when there were deviations form that policy – for example, when she teleworked all of last week and when her brother passed, that your checked with me before approving that.

I let her know that you'd be sending her the email I sent out to all the branch chiefs. She expressed concern that our telework policy was unfair because some employees were granted flexibilities that others were not.

I did not comment on the specifics of the two individuals who were on full time telework or near full time telework. I did tell her that all requests employees submitted were considered carefully. I did also let her know that other organization with similar customer service missions, such as OPPA, telework a lot less frequently (1 day per week) than BPAD and reiterated that telework is the managers discretion.

She mentioned she filled out her request again, this time using the proper forms.

Benson Dec. ¶ 22 & Ex. E (Kirton AFPD 554) (Ex. 5).

41. The new application that Plaintiff submitted on January 20, 2016, stated that Plaintiff would come into the office Wednesday and Thursday of the second week and Friday would be an off-day due to her compressed work schedule (CWS). Ellis Decl. Ex. F (Ex. 3). The application requested this new telework arrangement to begin on February 21, 2016. *Id.* The application listed Plaintiff's official duty station as Washington, D.C. Plaintiff designated her home address in Chester, Virginia, as the alternate work location where she would be teleworking. *Id.*; Ellis Decl. ¶ 22; Ellis Decl. Ex. G (2017 ROI, Tab G-10) (Ex. 3).

42. On January 21, 2016, Ellis emailed Plaintiff the guidance she received from Benson on April 23, 2015, regarding the requirement that employees be in the office at least two days per week. Ellis Decl. ¶ 21 & Ex. G (2017 ROI, Tab G-10) (Ex. 3). Plaintiff responded, "Thank you Melissa I appreciate your input; however I am going to stick with the request sent to you on yesterday." Ellis Decl. Ex. G.

43. Ellis denied the request a second time because Plaintiff had provided no new information in support of her request. Ellis Decl. ¶¶ 22-23; Ellis Decl. Ex. G (Ex. 3). Moreover,

it was unclear to Ellis why Plaintiff had indicated on the application that she would be teleworking from Chester, VA, when in fact she had already moved from Virginia to Florida. *Id.*

44. On January 29, 2016, Plaintiff appealed Ellis' denial of Plaintiff's telework request to Benjamin Moncarz, Budget Director, and Matthew Allen, Executive Officer, who forwarded the appeal to Benson, Plaintiff's second level supervisor. 2017 ROI, Tab G-11 at 2-3 of 5 (Ex. 16). Benson reached out to Kirsten Gunsolus, Human Resource Specialist, who helped draft a response. Benson Decl. ¶ 20.

45. Benson denied Plaintiff's appeal because she determined that Plaintiff had not put forth an adequate justification in support of her request for full-time telework. Benson ¶ 20. Also problematic for Benson was the fact that Plaintiff had evidently created the circumstances underpinning her need for full-time telework. *Id.* Benson felt it was rather presumptuous of her to move to Florida before she obtained approval for her request for full-time telework. *Id.*

46. While the Agency generally tried to be accommodating of employees, granting Plaintiff's request would mean Plaintiff would be out of the office more than permitted by BPAD policy and contrary to Benson's expectations on telework. Benson Decl. ¶ 21. Benson was concerned that if the Agency granted Plaintiff's request other employees would expect that the Agency would also grant similar requests until everyone was working remotely close to full-time. *Id.* Benson did not want to set a precedent that anyone could just create the circumstances to justify full-time telework, like moving far away from their duty station as Plaintiff had, and then request full-time telework. *Id.*

47. Benson denied Plaintiff's appeal for the above reasons on February 2, 2016, advising Plaintiff that she agreed with Ellis's decision to deny the request. Benson Decl. ¶ 22 & Ex. D (ROI Tab G-11 at 2 of 5) (Ex. 5).

**V.     Reminders Sent to All BPAD Employees in 2016 Regarding BPAD Telework Policy.**

48.     On February 16, 2016, Benson sent an email advising all employees of the BPAD telework policy that each supervisor and direct report must be in the office together a minimum of twice a week.  "Exceptions may only be granted through [Budget Director Benjamin Moncarz] and / or [Benson]."  Kirton AFPD 730 (Ex. 17).

49.     On May 2, 2016, Ellis sent an email to her subordinates.  Among other things, with regard to telework she advised her employees, including Miller, Wohltman, and Miller, that "two days in the office weekly is the expectation however I am flexible if you need to change your days."   Ellis Decl. ¶ 24 & Ex. H (Kirton AFPD 389-90) (Ex. 3).

**VI.    The Agency's Unsuccessful Attempt to Bring Miller Into Compliance with BPAD Telework Policy and Miller's Removal Due to Poor Performance.**

50.     In late May and early June 2016, Ellis started working with HR Representative Goldberg regarding changing Miller's duty station back to Washington, D.C., due to the nature of his job and in the hopes that doing so would help improve his lagging performance.  Ellis Decl. ¶ 11 & Ex. I (FEMA 017) (Ex. 3).

51.     On June 29, 2016, Ellis sent Miller an email advising him that the Agency intended to change his duty station back to Washington, D.C., effective November 1, 2016, to bring his work situation into alignment with BPAD policy that required everyone to come into the office at least two days per week.  Ellis Decl. ¶ 26 & Ex. J (Kirton AFPD 067) (Ex. 3).  "As a Funds Control Budget Analyst, your job requires face-to-face engagement with customers and your Analysis Branch counterparts."  Ellis Ex. J (Ex. 3).[4]

---

[4]     Around this time in July 2016, Benson transferred another Division within FEMA and was no longer in Plaintiff's chain of command.  Benson Decl. ¶ 27.  Annemarie Juhlin became Plaintiff's new second-line supervisor.  *Id.*

52. The Agency needed to ensure sufficient personnel in the office on a daily basis and Ellis felt that Miller's performance would improve if he were required to come into the office for face-to-face client interaction and collaboration with colleagues at least two days per week. Ellis Decl. ¶ 27. The Agency gave Miller several months of advanced notice in case the Union wanted to bargain over the move and because he had been living in Oklahoma for a few years and Ellis wanted to give him a sufficient opportunity to make the necessary arrangements to move back to the Washington, D.C., area after having been gone for so long. *Id.*

53. On July 25, 2016, Miller responded to Ellis's duty station change letter with medical documentation advising against changing his work arrangement from home- to office-based work and recommending that he be permitted to continue working from his home in Oklahoma City. Ellis Decl. ¶ 28 & Ex. (FEMA 276-77) (Ex. 3).[5] Ellis interpreted this to be a request for reasonable accommodation. *Id.* Ellis coordinated the Agency's response with the Agency's Office of Equal Rights. *Id.*

54. On July 27, 2016, Miller and Ellis discussed Miller's work performance. Ellis Decl. ¶ 29 & Ex. L (FEMA 005-07). Ellis followed up with Human Resources to consider the Agency's options for potentially accommodating Miller while also addressing his performance issues. *Id.* ¶ 30 & Ex. L at FEMA 005 (Ex. 3).

55. Miller initiated a formal request for reasonable accommodation in September 2016. Miller requested to be permitted to retain his duty station in Moore, Oklahoma, as an accommodation for his medical issues. Ellis Decl. ¶ 31-33; Ex. M (FEMA 004 and attachment);

---

[5] Miller's specific medical condition is not relevant to this action. To protect his privacy, Defendant has redacted any references to Miller's specific medical condition from the exhibits filed with this Motion.

Ex. N (FEMA 003 and attachment); Ex. O (FEMA 278-85, 292) (all three documents part of Defendants' Exhibit 3).

56. After engaging in the interactive process with Miller, the Agency ultimately denied his request to work remotely full time because it determined that Miller could not perform the essential functions of the Budget Analyst position while working remotely from Oklahoma on a full-time basis. Ellis Dec. ¶ 34 & Ex. N.

57. In an attempt to further address Miller's lagging performance, the Agency also decided to place Miller a Performance Improvement Plan ("PIP"). Ellis Decl. ¶ 35. In the meantime, as a temporary accommodation the Agency permitted Miller to continue working from Oklahoma during the PIP. If Miller's performance improved and he successfully completed his PIP, then Ellis intended to consult further with Human Resources and the Office of Equal Rights as to the Agency's options regarding Miller's duty station and telework arrangements on a more long-term basis.

58. Ellis issued the PIP in January 2017, giving Miller an opportunity to demonstrate acceptable performance. Ellis Decl. ¶ 36. Ultimately, Miller's performance did not improve, which prompted his removal in August 2017. *Id.* ¶¶ 36-37 & Exs. P-R (Ex. 3).

**VII.  Wohltman's Change in Duty Station to New Jersey.**

59. Plaintiff's telework request alerted Ellis and Benson to the fact that BPAD had another employee, Jennifer Wohltman, whose telework arrangement needed to be reexamined and brought into compliance with FEMA's and BPAD's telework policy. Benson Decl. ¶ 23; Ellis Decl. ¶ 38.

60. Ellis was willing to continue permitting Wohltman to work from her home in New Jersey, but also wanted to bring her work arrangement into compliance with applicable Agency policy. Ellis Decl. ¶ 39. Therefore, Ellis sought permission from Benson to change

16

Wohltman's official duty station to her home in New Jersey. *Id.* ¶ 39. In response, Benson recommended that Ellis work with a Human Resources Specialist to decide whether to move forward with the request. *Id.*

61. Unlike Plaintiff or Miller, Wohltman was an Accountant whose work was independent. Ellis Decl. ¶ 40. Wohltman's official duty station was in FEMA Headquarters in Washington, D.C. *Id.* Her customers were located at FEMA Finance Center, in Winchester, VA, however, which is 75 miles away. *Id.* That meant that regardless of whether her official duty station was Washington, D.C., or New Jersey, it was not likely to have a significant impact on the amount of time she would spend on site at the FEMA Finance Center. *Id.*

62. In Ellis's assessment, the above factors made Wohltman's job more suitable for remote work. Ellis Decl. ¶ 41. Additionally, her husband was working in New Jersey and she had recently given birth. Ellis was worried that terminating Wohltman's telework arrangement would compel her to seek employment elsewhere, which would not have been a desirable outcome because Ellis considered Wohltman a high performer. *Id.*

63. On May 23, 2016, Ellis sent a request to Benson asking for permission to change Wohltman's duty station to New Jersey. Ellis Decl. ¶ 42 & Ex. S (Kirton AFPD 392-93) (Ex. 3). In the May 23 request, Ellis listed the pros and cons of changing Wohltman's duty station. Among her comments, Ellis noted that Wohltman's current telework situation was not in compliance with the FEMA Telework policy and that all employees needed to be in the office a minimum of two days per pay period. *Id.* Changing Wohltman's duty station to New Jersey would bring her into compliance with the FEMA and BPAD telework policies. *Id.*

64. On July 8, 2016, Ellis sent another memorandum to Benson requesting permission to permit Wohltman to change her duty station to her home in New Jersey. Ellis Decl. ¶ 43.

65. In support of the request, Ellis stated that Wohltman was the only Accountant in BPAD and her duties were different from the Budget Analysts and other employees in BPAD. Ellis Decl. ¶ 43 & Ex. S (Ex. 3). Wohltman's work was performed independently and her sole customer was the OCFO FEMA Finance Center in Winchester, VA. *Id.* Therefore, changing her duty station from D.C. to New Jersey would not have likely have any great effect on her ability to collaborate with her clients. *Id.*

66. Additionally, Ellis noted that Wohltman's performance had been superior, she had received a DHS Outstanding Employee Award from the Secretary of DHS, and had been one of only three OCFO employees to receive a Quality Step Increase due to her stellar performance. Ellis Decl. ¶ 45. In other words, she had already demonstrated consistent performance at a high level while teleworking. *Id.* Ellis also noted that if they did not agree to change Wohltman's duty station to New Jersey, she would likely seek another job, and that it would be difficult to replace her. *Id.*

67. Benson signed Ellis's request and forwarded it to Benjamin Moncarz, Budget Director, on July 15, 2018. Ellis Decl. ¶ 42 & Ex. T (Kirton AFPD 373) (Ex. 3); Benson Decl. ¶ 24.

68. On August 11, 2016, Moncarz approved Ellis's request to change Wohltman's duty station to her home in New Jersey. Ellis Decl. ¶ 45 & Ex. U (Kirton AFPD 719) (Ex. 3). Moncarz stated that he was granting the request because: (1) she did not have any customers in Washington, D.C. that require consistent interactions; (2) her work is done independently; and (3) her sole customer was the OCFO Finance Center located in Winchester, VA so she was already working in a location different from her customer since her duty station was FEMA Headquarters in Washington, D.C. Ellis Decl. Ex. T.

Dated: September 9, 2020                Respectfully submitted,

                                              MICHAEL R. SHERWIN
                                              Acting United States Attorney

                                              DANIEL F. VAN HORN
                                              D.C. Bar 924092
                                              Chief, Civil Division

                                    By:     */s/ Daniel P. Schaefer*
                                              DANIEL P. SCHAEFER
                                              D.C. Bar 996871
                                              Assistant United States Attorney
                                              555 4th Street, N.W.
                                              Washington, D.C. 20530
                                              (202) 252-2531
                                              Daniel.Schaefer@usdoj.gov

                                              *Counsel for Defendants*