IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALICIA KIRTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No.: 1:18-cv-01580 RCL |
| CHAD F. WOLF, Acting Secretary, | ) |
| U.S. DEPARTMENT OF HOMELAND | ) |
| SECURITY | ) |
| | ) |
| and | ) |
| | ) |
| FEDERAL EMERGENCY MANAGEMENT | ) |
| AGENCY, | ) |
| | ) |
| Defendant | ) |
| | ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Plaintiff, Alicia Kirton, by the undersigned herein submits her Opposition to the Defendant's Motion for Summary Judgment. Attached hereto is the Plaintiff's response to the Defendant's Undisputed Statement of Facts.

Introduction

The issue in this case is whether the Plaintiff, Alicia Kirton, an African-American woman, was discriminated against when her January 21, 2016, request to change her duty station and telework schedule were denied, but the Agency granted similar requests to two other employees, Mark Miller and Jennifer Wohltman. The government's brief is unnecessary long winded, delving into issues such as the Plaintiff's decision not to ultimately settle her case, which is the Plaintiff's right and has no place in this Summary Judgment motion. The government is not bringing an action to enforce a settlement.

The government also attempts to paint Ms. Kirton in a bad light regarding her move to Florida. This may be a worthwhile jury trial strategy, but that event is irrelevant to the overall legal contention in this case that the Plaintiff lost of $50,000 commuting to a job that can be done and could have been done 100% remotely. The Plaintiff was an African-American woman, two Caucasians were granted the same 100% telework and duty station change; one of whom couldn't even do the essential functions of the Budget Analyst GS-13 job.

As such, whether the Court reviews this case under the traditional two step process of the Plaintiff establishing a prima-facie case, then the three step burden shifting, as articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or under the more liberal U.S. Circuit Court for the District of Columbia *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008), as to whether the Plaintiff presented enough evidence to defeat Summary Judgment, in this case, the Plaintiff's evidence of disparate treatment based on race are unmistakable. Summary Judgment should be denied.

### I. Plaintiff's Counter Statement of Facts

It is undisputed that the Plaintiff, Alicia Kirton, African American, worked as a GS-13 budget analyst for the Federal Emergency Management Agency ("FEMA"). On January 21, 2016, Ms. Kirton's request to change her duty station and telework schedule was denied. Exhibit 1 (formal complaint).

Plaintiff's job requirement was to allocate and reallocate funding for programs within FEMA. (FEMA has many programs such as office of external affairs, mission support offices, office of security) [dkt. 29-25, pages 9-10 of 13]. Within each program there are different sectors. Id. Plaintiff's job was to move funding from general office to the other programs and

within each program to the different sectors. Id. This was all computer work. Id. There was no meeting anybody. Id. Plaintiff did not interact with program directors or managers, as each program puts in a spend plan – office plan how they will spend the funds for the year. Id. The program's budget analysts approve their plan. 99% of it is done by email and the information goes to a sharepoint. Id. Plaintiff's other significant duty was she was in essence a fund manager for the programs. Id. She studied how much of the budget allocated for a certain sector is actually being used. Id. She may have made recommendations to reallocate some of the funds from one program sector to another. Id. This was also done by email for the most part. There was no need for face to face interaction for this job duty. Id. As a rule, whatever meetings and interactions are done is through Lync (Skype for business). Id. Plaintiff attested that Eric Littlepage, Plaintiff's second line supervisor told Plaintiff there was no need for face to face interactions. Id. Ms. Kirton also offered to obligate herself to come into the office once per month. Exhibit 1.

Once Covid-19 hit, the Agency conceded that every person with the same GS-13 Budget Analyst job, did that job 100% remotely. [dkt. 29-27, pages 6-10]. There's no evidence in the record that the Agency suffered any lost customer because there was no face-face interaction by GS-13 Budget Analysts.

Ms. Kirton attested that as a result of her being denied her change in workstation and telecommuting, it cost her $600 a trip and as of the day she signed her interrogatories, August 6, 2019, her financial losses were $51,600. Id. at pages 9-10. Ms. Kirton had to commute from Florida twice per month. Id. at 9.

It is undisputed that Mark Miller, a Caucasian, was also a GS-13, Budget Analyst. Miller's teleworking began 10/25/12 Exhibit 2 (Agency Responses "AFPD" 000189). It

continued until at least 3.21.13 (Id.). On February 5, 2013, Michael Darby told Miller he had two ways to go. He could either apply for medical telework or for FMLA Exhibit 3 (AFPD 000274). On February 20, 2013, Miller expressed to Darby that he needed to stay in the prone position to avoid blood clotting and as such, was incapacitated Exhibit 4 (AFPD 000254). On March 13, 2013, Darby told Evan Farley that Miller asked for telework which would be good for 6 months and that he would review the telework agreement every 30 days Exhibit 5 (AFPD 000185 -186). Winona Cason informed Darby on 3/19/13 that Miller's telework trial period was supposed to end in January, 2013 Exhibit 6 (AFPD 000193). On April 14, 2013, Darby told Miller that his telework request was approved and that he had to approve the medical documentation every 30 days Exhibit 7 (AFPD 000236). On July 2, 2013, a person described at "Ed" approved Miller's request due to his "medical situation" for six months. Exhibit 8 (AFPD 000080). This was also approved by Darby on 7/3/13 until 7/29/13 or at most until 9/18/13. Exhibit 9 (AFPD 000156).

On May 31, 2016, an email from Ellis to Julia Goldberg details the teleworking issues of Alicia Kirton, Mark Miller and Jen Wohltman. She describes Miller as the decision having been made by someone else 3 years ago Exhibit 10 (AFPD 000385-386). She further explains that Ms. Wohltman was hired with a special skill set who lives in New Jersey and she is an exception to the BPAD telework rules and that last week Ellis sent a memo to Benson to request a duty station change to New Jersey. Ellis in describing Ms. Kirton states that she moved to Florida at the end of 2015, she has asked for a lot of unscheduled telework and that while she wasn't filing for a reasonable accommodation claim, she did suffer from a torn ligament and part of her reasoning for moving to Florida was the warmer climate would aid her recovery. Id.

On June 10, 2016, Ellis told Goldberg that she intended to move Miller's duty station back to DC. The medical reasons behind his original move were documented. Exhibit 11 (AFPD

000068). His job duties are similar in nature to all the other budget analysts. Id. Ellis further wrote, "I feel his job performance would improve by him coming into DC at least 2 days a week." Id. Ellis did not say, "the budget analyst job requirement itself is face-face interactions with customers or other third-parties." Id.

On June 19, 2016, an email from Ellis to Goldberg states, " I want to give Mark Miller 4 months notice of his change in duty station... Mark is a lead budge analyst. I rely on him for periodically acting for me when i take vacation and need sick leave." Exhibit 12 (AFPD 000311-000312).  In further reciting the history behind Mark Miller's duty station, Ellis noted that "Mark was placed in the funds control branch where we thought would be the best fit for someone who works remotely 100%." Id.

On June 29, 2016, Ellis notified Miller of his duty station change. Exhibit 13 (AFPD 000066). On July 25, 2016, Miller asked Ellis if he could keep his current employment situation Exhibit 14 (AFPD 000060). On July 25, 2016, Kurt Nance sent an email to Ellis that he spoke with Miller and notified him his duty station is moving back to DC. He had been working from home for past 3 years. Nance assume he's asking for reasonable accommodation (Id.). On July 28, 2016, Ellis and Goldberg corresponded documenting Mark Miller's poor performance Exhibit 15 (AFPD 000055).

On October 11, 2016, rather than instituting a performance improvement plan for Miller or taking any disciplinary action against him as of that date, Ellis and Goldberg permit Miller to obtain a doctor's opinion regarding a reasonable accommodation Exhibit 16 (AFPD 000014). On October 11, 2016, Miller's doctor opines that Miller cannot perform his essential job duties; that he suffers from fatal intracranial bleeding; these are episodic; there are no alternative accommodations Exhibit 17 (AFPD 000038). Ultimately, the Agency did terminate Mr. Miller,

5

but not because of he couldn't do the face to face meetings, but simply because he failed his performance improvement plan in June, 2017. [dkt. 29-6, pages 69-81].

With respect to Jeniffer Wohltman, Ellis went through a litany of all the reasons Wohltman should have received the 100% telework. Exhibit 18 (AFPD 000395-396). She lists the pros and cons. One of the cons she lists is that "we aren't in compliance if we allow her to do teleworking." Id. Ellis admitted that the agency was basically violating its own rules by permitting her to telework full-time.

Furthermore, the Plaintiff contended that Wohltman, if anything, had more of a reason to have in person contact because she's the head accountant who does the apportionment for the FEMA funds from DHS. [dkt. 29-25, page 7 of 13]. Ms. Wohltman should have been held to a higher standard because DHS would likely have people that would question her in person as to the reason for these allocations. Id. Also Ms. Ellis recently hired another African-American accountant, Amanda Robertson, who was not given the same telework, duty station rights and privileges of Wohltman pursuant to FEMA's own policy. Id.

## II.     Argument

Summary judgment is only appropriate when the record shows that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn there from, in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587.

A plaintiff asserting a Title VII discrimination claim "makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Martin v. D.C.,* 78 F.Supp.3d 279 (D.D.C. 2015). The Federal Courts in the District of Columbia have for the most part abandoned the approach of the prima facie case. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

Furthermore, the D.C. Circuit Court has held that by the time a "district court considers an employer's motion for summary judgment . . . the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision." *Id.* at 493. Once that has happened, the existence of a *prima facie* case is irrelevant and "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas.*" *Id.* at 494 (emphasis in original). Instead, the Court "must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . ?" *Id.*

In this case, there are issues of fact with respect to both the telework and duty station change equating to a tangible employment action and whether the Plaintiff was treated differently as compared to two Caucasian employees. As such, Summary Judgment should be denied.

### A. The discriminatory denial of Plaintiff's telework request constitutes an adverse employment action.

Defendant invites this Court to declare that, even if Defendant told Plaintiff that her telework request was denied because of her race, Plaintiff cannot recover for race discrimination under Title VII. Defendant's invitation should be denied.

As an initial matter, it must be noted that telework and work-from-home arrangements have dramatically increased over the last few years, even before considering the nearly universal remote work assignments put in place to combat the COVID-19 pandemic. For example, the U.S. Office of Personnel Management published a Guide to Telework in the Federal Government, where it stated:

> Federal telework programs are established primarily to meet agency mission and operational needs. **Telework saves money** by helping government reduce real estate and energy costs and promote management efficiencies; makes us more resilient in severe weather and other emergencies; **improves the quality of employee work-life**; and increases employment opportunities for persons with disabilities. **Advances in information technology have paved the way for increased telework.** However, telework is not a new concept and is not necessarily dependent on the use of technology. The key is for managers and employees to clearly define the work expectations and objectives, and **then to give employees the tools and flexibility needed to get the job done**.

https://www.telework.gov/guidance-legislation/telework-guidance/telework-guide/guide-to-telework-in-the-federal-government.pdf (last accessed on Oct. 21, 2020) (emphasis added). Indeed, in the latest report to Congress, the Office of Personnel Management included the following chart, showing that 22% of all federal employees telework and most employees that are eligible telework:

8



2019 Office of Personnel Management Status of Telework in the Federal Government, Report to Congress. https://www.telework.gov/reports-studies/reports-to-congress/2019-report-to-congress.pdf (last accessed on Oct. 21, 2020).

Additionally, in a 2014 Presidential Memorandum, President Obama clearly set forth the policy of the federal government:

> Therefore, it is the policy of the Federal Government **to promote a culture in which managers and employees understand the workplace flexibilities** and work-life programs available to them and how these measures can improve agency productivity and employee engagement. **The Federal Government must also identify and eliminate any arbitrary or unnecessary barriers or limitations to the use of these flexibilities** and develop new strategies consistent with statute and agency mission to foster a more balanced workplace.

https://obamawhitehouse.archives.gov/the-press-office/2014/06/23/presidential-memorandum-enhancing-workplace-flexibilities-and-work-life- (last accessed on Oct. 21, 2020) (emphasis added).

Of course, as noted in the Guide to Telework above, there have been significant technological advances over the last few years that permit more job duties to be performed outside of the traditional office setting. Indeed, even examinations of witnesses by attorneys in depositions are being successfully conducted remotely. *See Doe v. Exxon Mobil Corp.*, No. 1:01-cv-1357, 2020 U.S. Dist. LEXIS 151238 (D.D.C. August 10, 2020).

Plaintiff's claim that Defendant's denial of her telework request must be evaluated against this background, and Defendant's argument that it can discriminate on the basis of race in approving or denying telework requests without liability must be rejected. "Adverse employment actions are not confined to hirings, firings, promotions, or other discrete incidents." *Ritchie v. Napolitano*, 196 F. Supp. 3d 54, 60 (D.D.C. 2016) (quotation and citations omitted). An "employee must experience materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quotations and citations omitted).

Defendant's discriminatory denial of Plaintiff's request, despite her ability to perform her job remotely, meant that she was forced to commute from her home in Florida to her duty station in Washington, D.C. This resulted in Plaintiff being forced to spend $1,200 per month to commute for 25 months. While Defendant may not have affirmatively reduced Plaintiff's pay, it should be beyond question that the decision materially affected her "terms" and "conditions" of employment. These facts are even more egregious than those in *Weng v. Solis* where the court found that a "reasonable fact finder could find that [the denial of a telework request] materially affected the terms, conditions, or privileges of Plaintiff's employment." 960 F. Supp. 2d 239, 249 (D.D.C. 2013). Defendant's omission of the *Weng* decision is notable.

The reality of this situation is analogous to a denial of a lateral transfer. Even though Plaintiff's pay and traditional benefits would not change, the presence of other circumstances qualify this denial as an adverse employment action. *See Ritchie*, 196 F. Supp. 3d at 61 ("A plaintiff who is denied a lateral transfer – *i.e.*, a transfer in which the plaintiff suffers no diminution in pay or benefits – does not suffer an actionable injury **unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment** . . .") (emphasis added) (citations omitted). Relatively recently, the D.C. Circuit Court reversed a grant of summary judgment on a lateral transfer case, finding that the discriminatory bias of the supervisor constituted "other materially adverse consequences." *Ortiz-Diaz v. HUD*, 867 F.3d 70, 74-75 (D.C. Cir. 2016). The concurrence in that case, authored by then Judge (now Justice) Kavanaugh, is particularly notable:

> That said, uncertainty will remain about the line separating transfers actionable under Title VII from those that are not actionable. In my view, the en banc Court at some point should go further and definitively establish the following clear principle: **All discriminatory transfers (and discriminatory denials of requested transfers) are actionable under Title VII**. As I see it, **transferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes discrimination with respect to "compensation, terms, conditions, or privileges of employment" in violation of Title VII**. 42 U.S.C. § 2000e-2(a). I look forward to a future case where our Court says as much.

*Id.* at 81 (Kavanaugh, J. concurring) (emphasis added).

None of the cases relied upon by Defendant require a different result. Many of the cases precede the rise of telework arrangements and technological advances discussed above. Further, none of the cases involved such a significant change in the terms and conditions of employment (the long-term commute from Florida to D.C.). For example, *Brown v. Jewell*, 134 F. Supp. 3d 170 (D.D.C. 2015), involved an employee who simply desired to telecommute two days per week. In *Byrd v. Vilsack*, 931 F. Supp. 2d 27 (D.D.C. 2013), the agency severely limited

11

telework arrangements when the employee made the request in 2007, permitting them only for medical accommodations and emergency situations. Further, the court limited its ruling by stating "the denial of an employee's request to work from home **on a few occasions, without more,** does not constitute an adverse employment action under Title VII." *Id.* at 41 (emphasis added). And in *Brockman v. Snow*, 217 F. App'x 201 (4th Cir.), the Fourth Circuit was reviewing a case where the request was made back in 2002, nearly 20 years ago. Additionally, the plaintiff in *Brockman* made a short-term request based on a complication with her pregnancy.

As described above, the cases relied on by Defendant are distinguishable from this case. This is not a case where Defendant's decision resulted in a "minor annoyance." *See Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 149 (D.D.C. 2010) ("Being denied the ability to work from home on, at most, three occasions is a minor annoyance, not an adverse action."). Here, the discriminatory denial of Plaintiff's request for 95-100 percent telecommuting clearly resulted in a material change in the terms and conditions of her employment – namely, extensive commuting time and $1,200 of commuting expense per month.

Based on Plaintiff's circumstances, the prevalence of telecommuting arrangements in the federal government, and the technological advances permitting Plaintiff to perform her work remotely, the discriminatory denial of her telecommuting request was an adverse employment action. Defendant should not be permitted to freely discriminate among its employees based on race or any other protected classification with regard to telecommuting arrangements.

The case law the Defendant cites was written in a time period where most employees could not and did not do their jobs teleworking. Hence, whether an employee commutes two days a week, compared to three or four, the overall difference in that employee's life is not that significant as to constitute a change in his or her employment conditions. In today's era,

technology has drastically changed the employer's workplace. Any federal employee like Ms. Kirton should be able to move to some small town in Arkansas, live in a mansion at 35% of the cost of living in Bethesda, Maryland. Denying her that opportunity is basically forcing a living area requirement on an employee for absolutely no reason. Assuming the Court finds the government's case law persuasive, the case law on this issue of tangibility should be updated to reflect this new world.

### B. The Plaintiff's Two Listed Co-Workers are Legitimate Comparators

As stated above, Mark Miller, a Caucasian, had the same job title as the Plaintiff and he was allowed a station change to Oklahoma. The Defendant attempts to distinguish these two individuals, Kirton and Miller, by virtue of Miller suffering from a medical condition, thereby enabling him a special situation above Kirton.

However, this is not what happened. On February 5, 2013, Michael Darby told Miller he had two ways to go. He could either apply for medical telework or for FMLA Exhibit 3 (AFPD 000274). There is no evidence in the record that Miller opted for either of these two avenues.

On March 13, 2013, Darby told Evan Farley that Miller asked for telework which would be good for 6 months and that he would review the telework agreement every 30 days Exhibit 5 (AFPD 000185 -186). Winona Cason informed Darby on 3/19/13 that Miller's telework trial period was supposed to end in January, 2013 Exhibit 6 (AFPD 000193). On April 14, 2013, Darby told Miller that his telework request was approved and that he had to approve the medical documentation every 30 days Exhibit 7 (AFPD 000236). On July 2, 2013, a person described at "Ed" approved Miller's request due to his "medical situation" for six months. Exhibit 8 (AFPD 000080). This was also approved by Darby on 7/3/13 until 7/29/13 or at most until 9/18/13. Exhibit 9 (AFPD 000156).

In essence, Miller's change of duty station to Oklahoma was supposed to be monitored for years and it wasn't. The Agency states in its brief that Ellis became Miller's first-line supervisor in April, 2015. [Dkt. 29-1, page 20 of 27]. Unlike the Agency's contention that Miller was "Grandfathered in" to a workstation in Oklahoma exception, there is no written document confirming that contention. Rather, there were emails establishing that with Miller's situation being monitored, it could continue through various points, like 30 days or six months.

According to the Agency, Ellis began a process in June, 2016, to attempt to move Miller's duty station back to DC. Ellis wrote, "I feel his job performance would improve by him coming into DC at least 2 days a week." Exhibit 11 (AFPD 000068). Ellis did not say, "the budget analyst job requirement itself is face-face interactions with customers or other third-parties." Id.

This is really the core of the comparison. If it is true as the Agency contends that the Budget Analyst job required the two day per period face to face interaction, then Ellis simply would have required Miller to return to DC. If that wasn't required, Miller's performance on the rest of his duties would have been irrelevant. Furthermore, there wouldn't have been any need to place Miller on a Performance Improvement Plan. That he was given such a plan and an opportunity to continue his job, notwithstanding that which the Agency contends are basically essential functions of a job.

Notably, Miller's doctor conceded that Miller couldn't have performed the essential functions of his job, but that was not with reference to the face to face meetings. Exhibit 17 (AFPD 000038). Rather that was with respect to his overall inability to do his job even remotely. Id.

14

As such, the Agency really favored this white male. He couldn't do his job, most likely for years, and nonetheless, the Agency and eventually, Ellis permitted him to continue with it, remotely. Miller was placed in the funds control branch where the Agency thought he would be the best fit for someone who works remotely 100%. Exhibit 12 (AFPD 000311-312). However, there is little to no evidence in the record that the Plaintiff suffered from poor job performance.

Additionally, Ms. Kirton attested as stated above, that her job did not require this face to face continued interaction. This attestation coupled with Miller's work history of not doing the face to face interactions creates an issue of fact surrounding the Agency's alleged reasons for not granting the Plaintiff the duty station change.

With respect to Ms. Wohltman, accountant or not, as stated above, the Agency was not in compliance with its own telework requirements. Exhibit 18 (AFPD 000395-396). Additionally, Ms. Kirton attested that Wohltman was the head accountant who did the apportionment for the FEMA funds from DHS. [dkt. 29-25, page 7 of 13]. Ms. Wohltman should have been held to a higher standard because DHS would likely have people that would question her in person as to the reason for these allocations. Id. Also, according to the Plaintiff, Ms. Ellis recently hired another African-American accountant, Amanda Robertson, who was not given the same telework, duty station rights and privileges of Wohltman pursuant to FEMA's own policy. Id.

It is well established that one way that an employee can prove his employer's stated reason is pretext is by pointing to the "employer's failure to follow established procedures or criteria." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495, n3, 380 U.S. App. D.C. 283 (D.C. Cir. 2008).

October 23, 2020                          ___/s/_Morris. E. Fischer_____
Date                                            Morris E. Fischer
                                                           Morris E. Fischer, LLC
                                                           8720 Georgia Avenue, Suite 210
                                                           Silver Spring, MD 20910
                                                           301-328-7631 Office
                                                           301-328-7638 Fax
                                                           morris@mfischerlaw.com
                                                           *Attorney for Plaintiff*